UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC V. MARTIN,

        Petitioner,

v.                                             CASE NO. 05-CV-40039-FL
                                              HONORABLE PAUL V. GADOLA

JAN TROMBLEY,

        Respondent.
_____/

## **OPINION AND ORDER GRANTING**
## **RESPONDENT'S MOTION FOR SUMMARY DISPOSITION**
## **AND**
## **DISMISSING HABEAS CORPUS PETITION**

Petitioner Eric V. Martin has filed a *pro se* application for the writ of habeas corpus under 28 U.S.C. § 2254. Currently pending before the Court is Respondent's motion for summary disposition and dismissal of the habeas petition. The Court agrees with Respondent that the habeas petition is time-barred. Therefore, Respondent's motion will be granted and the habeas petition will be dismissed.

### **I. Background**

On November 5, 1991, a circuit court jury in Oakland County, Michigan found Petitioner guilty of four counts of first-degree murder, MICH. COMP. LAWS § 750.316,[1] one count of breaking and entering, MICH. COMP. LAWS § 750.110, one count of unarmed robbery, MICH. COMP. LAWS §

---

[1] There was only one victim, but the prosecutor proceeded on four different theories of first-degree murder: (1) murder committed during the commission of a breaking and entering; (2) murder committed during the commission of a robbery, (3) murder committed during the commission of criminal sexual conduct; and (4) premeditated murder.

750.530, and one count of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b.

These convictions arose

> from the robbery, rape, and strangulation murder of Nichole Hudock in her Southfield apartment on June 24, 1990. Defendant's accomplice, Eric Allen, arrested on June 26 for an unrelated offense in Highland Park, implicated defendant in that case. Hearing that he was wanted in connection with that offense, defendant turned himself in to the Detroit police. Police subsequently discovered that the Mazda Miata Allen had been driving belonged to Hudock. During police questioning on June 27, Allen gave a statement implicating both himself and defendant in the Hudock robbery, while attributing Hudock's rape and death exclusively to defendant. Shortly afterwards, defendant was questioned by both Detroit and Southfield police. After defendant denied any knowledge of the Hudock case, he was shown a pawn ticket for Hudock's bracelet discovered at the time of his arrest. He then admitted that he and Allen selected Hudock as their victim because they thought she was wealthy, and climbed through her open window as she slept, and robbed her. Defendant also admitted attempting to gag Hudock, but attributed that rape and murder solely to Allen. Defendant enumerated the items taken from the apartment and admitted disposing of them. Later, enroute to Southfield, he identified the dumpster in which he and Allen had discarded Hudock's purse.
>
> Defendant was arraigned the following day. After the arraignment, defendant gave another statement in which he admitted holding Hudock in a headlock and attempting to cover her mouth while Allen choked her from behind.
>
> Later, defendant and Allen both sought suppression of their statements as involuntarily given. At the *Walker*[2] hearing, defendant testified that his statements to the police were given as a result of promises of leniency and threats to inconvenience defendant's pregnant girlfriend. The trial court, after reviewing all the testimony, found the officers' testimony credible, and found that the statements were freely, knowingly, and voluntarily given, with full awareness of constitutional rights. The court particularly challenged the credibility of defendant's assertion that he cooperated only in order to avoid inconveniencing his girlfriend, stating,
>
>> I believe that Mr. Martin decided to give his statement [the first of the two] to the officers, and that he decided to do so in as self-serving a fashion as was possible, because he concluded that they were connecting him anyway without his statements through the pawn ticket and the possibility of [further] discoveries at his girl friend's

---

[2] *People v. Walker* (On Rehearing), 374 Mich. 331; 132 N.W.2d 87 (1965).

>     [sic] house.
>
>     Defendant and Allen were tried separately. At trial, there was evidence that defendant's sister lived in the same apartment complex as Hudock, that defendant had been seen "casing" Hudock's apartment a week before the break-in, that defendant and Allen had displayed a noteworthy amount of money a day or so after the break-in, that defendant's girlfriend accompanied him when he pawned the victim's camcorder, and that semen found in the victim's vagina was produced by a blood-type A secretor, consistent with defendant.
>
>     Defendant testified that he did not participate in the break-in, but heard about Hudock's murder and Allen's involvement in it from other people. He later ran into Allen, driving a white Mazda Miata, on two occasions. On the second occasion, Allen had a number of items which he asked defendant to help sell. Defendant agreed, knowing that items were stolen, and pawned them in return for a half-share in the proceeds. As earlier, defendant testified that his statements to police were given as a result of threats to inconvenience defendant's girlfriend and promises of leniency, particularly a promise that if he cooperated with police in incriminating Allen, defendant would be charged only with receiving and concealing stolen property.

*People v. Martin*, No. 148470, at 1-2 (Mich. Ct. App. Oct. 26, 1994) (footnote in original).

Petitioner's defense was that he did not commit the charged crimes, that he did not know the victim and was never in her apartment, and that, at most, he was guilty of being an accessory after the fact. The jury was unpersuaded by Petitioner's defense and convicted him as charged. The trial court sentenced Petitioner to life imprisonment for the murder convictions, ten to fifteen years in prison for the robbery and breaking and entering convictions, and forty to one hundred years in prison for the criminal sexual conduct conviction.

Petitioner raised his fourth and fifth habeas claims regarding his statements to the police on direct appeal from his convictions. The Michigan Court of Appeals vacated the three felony murder convictions on double jeopardy grounds, but otherwise affirmed Petitioner's convictions. *See id.* at 5. On June 30, 1995, the Michigan Supreme Court denied leave to appeal because it was not

persuaded that the questions presented should be reviewed. *See People v. Martin*, No. 101551 (Mich. Sup. Ct. June 30, 1995). Petitioner's convictions became final 90 days later on September 28, 1995, when the deadline expired for seeking a writ of certiorari in the United States Supreme Court. *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000) (citing *Isham v. Randle*, 226 F.3d 691, 694-95 (6th Cir. 2000)).

On March 16, 1996, Petitioner filed a motion for relief from judgment. The trial court denied his motion for lack of merit in the grounds presented. On appeal from the trial court's decision, Petitioner raised a number of issues concerning the prosecutor's closing argument, defense counsel's representation, the trial court's failure to suppress his statements to the police, hearsay evidence, the sufficiency of the evidence, and the jury instructions. The Michigan Court of Appeals denied leave to appeal "for failure to meet the burden of establishing entitlement to relief under [Michigan Court Rule] 6.508(D)." *People v. Martin*, No. 202944 (Mich. Ct. App. Jan. 15, 1998). On December 30, 1998, the Michigan Supreme Court denied leave to appeal for the same reason, *see People v. Martin*, No. 111990 (Mich. Sup. Ct. Dec. 30, 1998), and on March 30, 1999, the state supreme court denied Petitioner's subsequent motion for reconsideration.

Petitioner alleges that, in 1999, his father acquired new evidence consisting of a report from Cellmark Diagnostics ("Cellmark") of Germantown, Maryland. According to Petitioner, his father sent the report to Speckin Laboratories in Okemos, Michigan. Speckin allegedly informed Petitioner's father that Cellmark's DNA analysis excluded Petitioner as a suspect.

Petitioner states that his father hired an attorney in June of 2000, and on April 22, 2003, the attorney moved for relief from judgment on the basis of newly discovered evidence. The trial court denied Petitioner's motion, and the Michigan Court of Appeals dismissed Petitioner's subsequent

appeal for lack of jurisdiction. The court of appeals noted that Petitioner had filed a second motion for relief from judgment in violation of Michigan Court Rule 6.502(G)(1), and that the exception for newly discovered evidence was inapplicable because Petitioner could have discovered the new evidence before he filed his first motion for relief from judgment in 1996. *See People v. Martin*, No. 254963 (Mich. Ct. App. May 26, 2004).[3] On December 29, 2004, the Michigan Supreme Court denied leave to appeal, because Petitioner's "motion for relief from judgment [wa]s prohibited by [Michigan Court Rule] 6.502(G)." *People v. Martin*, No. 126645 (Mich. Sup. Ct. Dec. 29, 2004).

The pending habeas corpus petition is dated February 1, 2005. The grounds for relief read:

I. The prosecutor suppressed exculpatory DNA evidence from the defense.

II. Prosecutor suborned perjury by allowing Lynn Helton to testify that DNA testing was never done.

III. Prosecutor suborned perjury by allowing Lynn Helton to testify that semen was found and matched defendant's blood, evidence contrary to DNA test.

IV. An illegal statement was made by defendant after arraignment, where defendant never knowingly waived his right to counsel.

V. The trial court erred when it refused to suppress defendant's 2 incriminating statements after a Walker Hearing.

Respondent argues that these claims are barred from substantive review by Petitioner's failure to comply with the statute of limitations.

## II. Discussion

### A. The Statute of Limitations

---

[3] Michigan Court Rule 6.502(G) prohibits the filing of successive motions for relief from judgment unless the motion alleges a retroactive change in the law or a claim of new evidence.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted on April 24, 1996.  Among other things, it established a one-year period of limitations for habeas petitions filed by state prisoners.  *See* 28 U.S.C. § 2244(d).  The limitations period runs from the latest of

> **(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> **(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> **(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> **(D)** the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Petitioner's conviction became final for purposes of § 2244(d)(1)(A) in 1995 before the AEDPA was enacted.  Consequently, he was afforded a one-year grace period, or until April 24, 1997, to file his habeas petition.  *Carey v. Saffold*, 536 U.S. 214, 217 (2002); *Ross v. Berghuis*, 417 F.3d 552, 554 (6th Cir. 2005).  Because Petitioner's first motion for relief from judgment was pending in state court on April 24, 1997, the limitations period was tolled until Petitioner's motion "achieved final resolution through the State's post-conviction procedures." *Saffold*, 536 U.S. at 220; *see also* 28 U.S.C. § 2244(d)(2)(stating that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection").  The state supreme court denied reconsideration on March 30, 1999.  The limitations period was tolled an additional ninety days for the time during which Petitioner could have filed a petition for the writ of

certiorari in the United States Supreme Court. *See Abela v. Martin*, 348 F.3d 164, 172-73 (6th Cir. 2003) (holding that, "under section 2244(d)(2), the statute of limitations is tolled from the filing of an application for state post-conviction or other collateral relief until the conclusion of the time for seeking Supreme Court review of the state's final judgment on that application independent of whether the petitioner actually petitions the Supreme Court to review the case"), *cert. denied*, 541 U.S. 1070 (2004). The deadline for seeking a writ of certiorari expired on June 28, 1999. It was then that the statute of limitations began to run, and it expired one year later on June 28, 2000. The habeas petition was not filed until February of 2005. It is time-barred, absent tolling.

### B. The Exception for Newly Discovered Evidence

Petitioner asserts that the statute of limitations did not begin to run until December 29, 2004, when the state courts completed their review of his second motion for relief from judgment. Thus, according to him, the deadline for his habeas petition was December 29, 2005, and his habeas petition, which was filed in February of 2005, was timely.

Section 2244(d)(1)(D) of Title 28, United States Code, starts the statute of limitations running from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." The Supreme Court has stated that, when a habeas petitioner bases a claim on the result of a DNA test, it is the result of the test that is the factual predicate for the habeas claim, and the one-year limitation period therefore begins to run from the date that the test result is discovered. *Johnson v. United States*, 544 U.S. 295, __, 125 S. Ct. 1571, 1581 (2005) (construing 28 U.S.C. § 2255 ¶ 6(4)).[4] The "due diligence" requirement of the statute,

---

[4] Section 2255 ¶ 6(4) is

however, "would say that the test result only triggers a new 1-year period if the petitioner began the testing process with reasonable promptness once the DNA sample and testing technology were available." *Id*.

Cellmark's laboratory report is dated February 28, 1991. Petitioner alleges that the report contains exculpatory DNA evidence and that the prosecutor withheld the report from him. Petitioner's trial attorney has signed an affidavit stating that he was unaware of the report.

Even assuming that Petitioner had no reason to inquire about DNA testing before trial or during the direct appeal from his convictions,[5] he could have requested a copy of any test results before he filed his first motion for relief from judgment in 1996. Petitioner replies that he could not have discovered the evidence earlier because his father was not involved in his case at the time and no one was available to make a request for him under the Freedom of Information Act. While it is true that, as of May 19, 1994, prisoners could no longer make requests under the Freedom of Information Act, *Seaton v. Wayne County Prosecutor*, 233 Mich. App. 313, 315-16; 590 N.W.2d 598, 599 (1998), neither *pro se* representation alone nor procedural ignorance excuse "prolonged

---

the counterpart to § 2244(d)(1)(D) that applies to habeas-like motions by federal prisoners attacking their sentences. The two provisions are almost identical, though, and the Supreme Court has interpreted the statute-of-limitations provisions of § 2244 and § 2255 in concert with one another. *See, e.g., Lackawanna County* [*Dist. Att'y v. Coss*, 532 U.S. 394, 402 (2001)] (plurality op. of O'Connor, J.).

*Shannon v. Newland*, 410 F.3d 1083, 1088 (9th Cir. 2005) (footnote omitted), *cert. denied*, __ S. Ct. __, 2006 WL 386397 (U.S. Feb. 21, 2006) (No. 05-664).

[5] A laboratory scientist for the Michigan State Police implied during trial that no evidence was submitted for DNA analysis. *See* Tr. Oct. 29, 1991, at 191-95. The state court record indicates that the scientist did submit evidence for DNA analysis. *See* Summary of Evidence Submitted for DNA Analysis contained in Michigan Court of Appeals docket number 254963.

inattention when a statute's clear policy calls for promptness . . . ." *Johnson*, 125 S. Ct. at 1582. Petitioner, therefore, has failed to show that he acted with "due diligence" or reasonable promptness in acquiring the test results.

Petitioner also did not act with reasonable diligence once he discovered Cellmark's DNA analysis. He alleges that his father acquired the information in 1999 and that they hired an attorney to pursue the matter of newly discovered evidence in June of 2000. Thus, by his own admission, Petitioner acquired the information he needed to support his claims no later than June of 2000. He did not file his habeas petition until February of 2005. Petitioner's second motion for relief from judgment, alleging newly discovered evidence, tolled the statute for part of the interval between 1999 and the date the habeas petition was filed. However, more than a year elapsed between the time Petitioner acquired the DNA evidence in 1999 and the date that he filed his second motion for relief from judgment in 2003. Therefore, the habeas petition is untimely even if the statute did not begin to run until 1999 when Petitioner allegedly discovered the DNA evidence.

### C. Actual Innocence

"The United States Supreme Court has held that a claim of actual innocence can be raised 'to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims.'" *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005) (quoting *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995)). And the United States Court of Appeals for the Sixth Circuit has held that equitable tolling is appropriate when it is based on a credible showing of actual innocence and the one-year statute of limitations has expired. *See id*. at 600-02. "A petitioner need not show that he is 'actually innocent' of the crime he was convicted of committing . . . ." *Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir. 2002). Instead, the actual-innocence exception is limited to the rare and extraordinary case where a habeas

9

petitioner presents new evidence which undermines the reviewing court's confidence in the outcome of the trial. *Souter*, 395 F.3d 600.

"To establish actual innocence, 'a petitioner must show that it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt.'" *Id.* at 590 (quoting *Schlup*, 513 U.S. at 327). "To be credible, such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324.

The new evidence in question indicates that Cellmark analyzed two swab ends labeled "original vag[inal] swabs," a yellow terry cloth material labeled "Item A," and blood-stained swatches from the victim, Petitioner, and Erik Allen. The results of Cellmark's testing were that: (1) DNA was extracted and DNA banding patterns were obtained from these items; (2) the DNA banding pattern obtained from the original vaginal swabs matched the DNA banding pattern obtained from blood-stained swatches labeled with the victim's name; (3) no other DNA banding patterns were obtained from the original vaginal swabs; and (4) the DNA banding pattern obtained from the yellow terry cloth does not match the DNA banding patterns obtained from the blood-stained swatches labeled with the names of the victim, Petitioner, or Erik Allen. Cellmark concluded that (1) the DNA banding pattern obtained from the original vaginal swabs matched the DNA banding pattern found in the victim's blood and (2) the DNA banding pattern obtained from the yellow terry cloth material did not originate from the victim, Petitioner, or Erik Allen.

The State's forensic scientist testified at trial that she detected semen on the victim's vaginal swabs and on a yellow wash cloth. (Tr. Oct. 29, 1991, at 186 and 199.) However, Cellmark's failure

10

to find Petitioner's DNA on the vaginal swabs and on the yellow wash cloth is not conclusive evidence of Petitioner's innocence. As the trial court explained in its order denying Petitioner's second motion for relief from judgment,

> the samples tested by Cellmark consisted only of "2 swab ends" and a "yellow terry cloth material cutting." The evidence examined by police consisted of several vaginal swabs and a yellow washcloth. The evidence entered at trial came from these *complete* evidentiary samples.

*People v. Martin*, No. 90-104417-FC (Oakland County Cir. Ct. Feb. 27, 2004) (unpublished decision) (emphasis in original).

Moreover, it is possible that the evidence submitted to Cellmark had deteriorated to the extent that some DNA material was missing. The State's serologist testified at trial that, to do a proper DNA analysis, it is necessary to have the whole DNA molecule extracted intact. The serologist claimed that the evidence submitted to her for analysis had begun to deteriorate. She explained that some genetic material is less susceptible to breaking down than the DNA molecule and that it had been possible for her to do blood typing. She stated that she had detected semen consistent with Petitioner's blood type in the victim's vagina. (Tr. Oct. 29, 1991, at 190-95.)

In light of this evidence and all the other evidence produced at trial, including Petitioner's own admissions, *see infra* Section I, this Court's confidence in the outcome of the trial is not undermined by the DNA evidence. The fact that Petitioner's DNA was not found on the victim's vaginal swabs or on a wash cloth taken from the victim's apartment does not contradict evidence tending to demonstrate that Petitioner and his co-defendant killed the woman. *Cf. House v. Bell*, 386 F.3d 668, 685 (6th Cir. 2004) ("[T]he fact that the semen found on the victim's clothing came from her husband and not from House does not contradict the evidence that tends to demonstrate that he

killed her after journeying to her home and luring her from her trailer, nor does the lack of any physical evidence of sexual contact contradict the notion that the murderer lured Mrs. Muncey from her home with a sexual motive."), *petition for cert. granted*, __ U.S. __, 125 S. Ct. 2991 (2005). The Court therefore concludes that Petitioner has not set forth a credible claim of actual innocence.

### III. Conclusion

To summarize, Petitioner's conviction became final before the AEDPA was enacted. His first motion for relief from judgment tolled the running of the limitations period until June 28, 1999. The limitations period expired one year later. Petitioner was not diligent in discovering DNA evidence, and more than a year elapsed between the time he allegedly discovered the evidence and the date that he filed his habeas petition, even if one tolls the limitation period for the time that his second motion for relief from judgment was pending in state court. The Court declines to equitably toll the limitations period on the basis of actual innocence, because Petitioner has not shown that it is more likely than not that no reasonable juror would have found him guilty in light of the new evidence.

The habeas petition is untimely, and neither statutory nor equitable tolling is appropriate. Therefore,

**IT IS ORDERED AND ADJUDGED** that Respondent's motion for summary disposition and dismissal [Doc. #5, Aug. 11, 2005] is **GRANTED**, and the application for a writ of habeas petition [Doc. #1, Feb. 3, 2005] is **DISMISSED**.

**IT IS FURTHER ORDERED** that, if Petitioner desires to seek a certificate of appealability ("COA"), he may file a **MOTION** for a COA with this Court within **THIRTY (30) DAYS** of filing a notice of appeal and shall support this motion with an appropriate brief, both of which shall comply with the Local Rules of this Court. *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002)

("**We do encourage petitioners as a matter of prudence to move for a COA at their earliest opportunity so that they can exercise their right to explain their argument for issuance of a COA.**" (emphasis added).  Respondent may file a response with an appropriate brief, both of which shall comply with the Local Rules, within **TWENTY (20) DAYS** of service of Petitioner's motion for a COA.

Dated:  February 28, 2006              s/Paul V. Gadola
                                       HONORABLE PAUL V. GADOLA
                                       UNITED STATES DISTRICT JUDGE

| Certificate of Service |
|---|
| I hereby certify that on   March 2, 2006  , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:                       Brenda E. Turner                           , and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:                Eric Martin                                        . |
|                                       s/Ruth A. Brissaud<br>                                       Ruth A. Brissaud, Case Manager<br>                                       (810) 341-7845 |